STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-03-247

STATE OF MAINE
Cumberland, ss, Clerk's Office
SUPERIOR COURT

JUL 1 1 2006

RECEIVED

FLEET NATIONAL BANK,

Plaintiff,

v.

L. DARRELL MAYEUX,

Defendant.

ORDER

Before the court is Fleet Bank's motion for remittitur and in the alternative for a new trial on the $7,448,026 judgment entered against it on defendant Darrell Mayeux's counterclaim.

Fleet's motion raises at least six grounds. At the outset, however, the court concludes that all but one of those grounds can be rejected without extended discussion. Specifically, the court adheres to its December 21, 2005 ruling with respect to Mayeux's right to a jury trial on his professional negligence claim. The court also adheres to its prior rulings on whether gross negligence should have been the appropriate standard and on whether Mayeux's claim was adequately supported by expert testimony. In addition, the court has considered Fleet's contentions with respect to mitigation of damages, Mayeux's failure to provide written notice of his retirement, and the alleged causation problems with respect to Mayeux's contention that he should have been permitted to substitute real estate as collateral. None of these arguments merit a new trial.

The remaining issue raised by Fleet and the issue on which it primarily relies is its contention that the $10,534,160 figure determined by the jury to represent the total damages to Mayeux (question 5 on the jury verdict form) cannot rationally be

supported by the evidence. From the $10,534,160 figure the jury deducted $3,086,134 based on Mayeux's own negligence, leaving Mayeux with a net jury verdict on his counterclaim of $7,448,026. Fleet seeks a remittitur that would have the effect of deducting $4,000,000 from the net jury verdict or, in the alternative, a new trial. See M.R.Civ.P. 59(a).

### 1.    Fleet's Remittitur Argument

At trial Mayeux offered expert testimony suggesting that Mayeux had incurred damages in the amount of $7,766,200. That number was based on the theory that Mayeux, if properly advised by the Fleet Private Client Group, would have sold enough Fairchild shares to pay off his outstanding $4,000,000 line of credit from Fleet and would then have implemented a stock "collar" that would have protected him against a decline in the value of Fairchild stock. Testimony of Robert Strong, Tr. 26-28, 31.[1]

Mayeux also elicited expert testimony that would have supported a considerably higher damage figure. This was based on the theory that Mayeux would have protected himself against a decline in his Fairchild stock by purchasing options to sell Fairchild at $25 per share but instead of exercising those options, would have sold the options and retained his Fairchild stock. Under this theory, using the share price of Fairchild as of March 14, 2006 (the second day of trial), Mayeux's damages would have been $9,397,763. Strong Tr. 35-39. Significantly, this latter theory also assumed that Mayeux would first have sold enough stock to pay off Fleet's $4 million line of credit. Strong Tr. 41, 44, 48.

---

[1] In connection with the instant motion, the testimony of various witnesses has been transcribed but no overall trial transcript has been prepared. A citation to "Strong Tr. 31", therefore, refers to the 31st page of Strong's testimony.

Fleet's motion for remittitur points out that the jury determined Mayeux's damages (before subtracting for comparative negligence) at a figure that was more than $1 million higher than the highest figure proposed by Mayeux. The Bank argues that the $10,534,160 figure is also higher than any award that could rationally be supported by the evidence. Specifically, the Bank argues, the jury must have determined its verdict by concluding that, if properly advised by the Bank, Mayeux would have sold all his Fairchild stock in November 2001 and that his damages therefore equaled the value of that stock at that time. A sale of Fairchild stock in mid-November of 2001 would have yielded Mayeux approximately $10,500,000.[2] The Bank argues that the jury therefore determined that $10,500,000 was the amount of damages that Mayeux suffered – but then failed to deduct from that figure the $4,000,000 necessary to pay off Mayeux's outstanding line of credit.

The Bank argues that the correct initial damage figure should therefore be $6,534,160 ($10,534,160 minus the $4,000,000 line of credit). The Bank also contends that the $3,086,134 amount which the jury determined to have resulted from Mayeux's comparative negligence should then be deducted from that $6,534,160 figure - for a net verdict of $3,448,026.

2.    Threshold Issues

Several issues must be addressed at the outset. First, although Fleet may have provided a plausible explanation for the jury's verdict,[3] there is no guarantee that Fleet

_____

[2] The Bank specifically surmises that the $10,534,160 figure determined by the jury was arrived at by taking 463,000 shares of Fairchild at closing share price of $22.32 on November 15, 2001 – an amount which equals $10,334,160. The Bank then suggests that the jury added $200,000 to this figure to compensate Mayeux for the approximate amount of interest that accumulated on his $4,000,000 line of credit after November 2001.

[3] Because the jury calculated Mayeux's damages at $10,534,160 – as opposed to $10,500,000 or even $10,535,000 – it does appear that the jury performed a precise calculation to arrive at its figure.

3

is correct. Moreover, the court's job on a motion for a new trial based on allegedly excessive damages is not to correct the verdict as a teacher might correct a math paper but to determine if there is any rational basis upon which the amount of the jury award may be supported. E.g., Town of Stonington v. Galilean Gospel Temple, 1999 ME 2 ¶ 17, 722 A.2d 1269, 1273. If remittitur is called for, the court should reduce the jury's award to the amount which is the maximum permissible as a rational jury determination. Nyzio v. Vallancourt, 382 A.2d 856, 861 (Me. 1978).

In this case, therefore, if the court were to conclude that there is no rational basis for the $10,534,160 damage figure, the court would be obliged to revert to the highest figure that could rationally be supported by the evidence rather than the $6,534,160 figure suggested by the Bank.

There also remains the further question of how the deduction for comparative negligence should be handled. As noted above, Fleet's motion suggested that any damage figure must be reduced by $3,086,134 to account for Mayeux's comparative negligence. Mayeux countered that since $3,086,134 represented 29.2% of $10,534,160, the same percentage reduction should be made from any alternative damage figure that the court determines can be rationally sustained by the evidence. The problem with this is that while the jury chose to deduct $3,086,134 from $10,534,160, the court has no basis to determine what amount the jury would have deducted from an award of $9,397,763. Moreover, to apply a percentage reduction would be contrary to the governing law. See Pomeroy v. Glidden, 1997 ME 118 ¶ 4, 695 A.2d 1185, 1186.

Questioned on this point at the oral argument, both counsel eventually opined that, if the court concludes that a new trial is called for, it will not have any exact basis to determine how much should be deducted from the highest damage figure that could rationally be supported by the evidence and might have to simply order a new trial on

4

all issues.[4] Perhaps the only conclusion that can be drawn is that $3,086,134 is the maximum amount that should be deducted from any damages award to account for the jury's finding as to comparative negligence.

Mayeux also argues that because the ultimate amount awarded ($7,448,026) was within a range that could be rationally supported by the evidence, the court need not consider whether the $10,534,160 figure on question 5 of the jury verdict form can be rationally supported by the evidence. Although the court is not aware of any Maine precedent on this issue, this argument appears to be contrary to prevailing authority from other states. See Meyers v. Wal-Mart Stores East, Inc., 77 F.Supp.2d 826, 837 (E.D. Mich. 1999), aff'd, 257 F.3d 625 (6th Cir. 2001); Carpenter v. Consumers Power Co., 584 N.W.2d 375, 383 (Mich. App. 1998), vacated on other grounds, 615 N.W.2d 17 (Mich. 2000); Fifer v. Nelson, 204 N.W.2d 422, 426 (Minn. 1973). Moreover, once a jury has been instructed to determine Mayeux's total damages and that figure forms the starting point for calculating the final award, it would be extremely difficult to justify a ruling that the ultimate award should be upheld even if the jury's starting figure cannot rationally be supported by the evidence.

Mayeux also argues that even if the jury's $10,534,160 damage figure was reached without subtracting $4,000,000 to pay off Fleet's line of credit, the verdict should nevertheless be sustained because repayment of the loan was a separate issue that did not need to be considered as part of the damages. The court strongly disagrees. One of the lynchpins of Mayeux's case was the contention that the Bank committed professional negligence by failing to give him appropriate advice to pay off his line of credit before the calamitous decline in the price of Fairchild stock. It

---

[4] A new trial as to damages alone cannot be ordered because any comparative negligence determination would require consideration of the extent to which both parties were negligent, which would therefore require a retrial of all liability issues.

5

undisputed that Mayeux had borrowed $4,000,000 from Fleet and that he had spent a considerable protion of that money on items such as the construction of his house in Cape Elizabeth. All of Mayeux's damage calculations were premised on repayment of the $4 million line of credit, and Mayeux never offered any legal theory that would have excused his obligation to repay that money to the Bank. A jury award that did not take into account the need to pay off the $4 million line of credit and that would convert that $4 million into a gift to Mayeux is not an award that could under any circumstances be upheld as rationally based on the evidence.

3.    Is the $10,534,160 Figure Rationally Supported by the Evidence?

The fundamental question remains whether the $10,534,160 damages figure can be rationally supported by the evidence. Put another way, would it have been possible for the jury to conclude that professional negligence by Fleet caused Mayeux to lose $14,534,160 -- from which he could have paid off the $4 million line of credit and retained $10,534,160?

At trial all of Mayeux's damage calculations were premised on his ownership of 463,000 shares of Fairchild as of the beginning of January 2002. See, e.g., Strong Tr. 31, 32, 38. At no point during the time period at or around Mayeux's retirement (October 2001 through December 2001) did the price of Fairchild reach the $31.39 price which would have been necessary (even excluding payment of commissions) for Mayeux to realize $14,534,160 from selling 463,000 shares. Fairchild's high during that time period was $28.20 on December 31, See Trial Ex. 292, at which point a sale of 463,000 shares would have yielded $13,056,600. Accordingly, if he had sold all his shares on December 31 and paid off the line of credit, Mayeux would have had $9,056,600 rather than $10,534,160.

6

Indeed, even if the relevant time period were broadened to the entire eight-month period before Mayeux notified Fleet on April 10, 2002 that he had hired Vigilant to manage his investments, the Fairchild share price never reached $31.39. The highest Fairchild share price that time period was $30.50 on March 8, 2002. As far as the court can tell from Exhibit 292, this was one of only four days in the entire period from January 1, 2001 to April 10, 2002 when Fairchild's share price equaled or exceeded $30 at some point during the trading day. On March 8, 2002 a sale of 463,000 shares at $30.50 would have netted Mayeux $14,121,500 before commissions. If, ignoring commissions, Mayeux had sold 463,000 shares at $30.50 and paid off his line of credit, he would have realized $10,121,500 – a figure which is still $412,660 less than the damage figure set by the jury.

Mayeux contends that he could have sold 463,000 shares for slightly more than $14,534,160 on April 17 or 18, 2002. However, this was a week after he had informed Fleet that he had hired Vigilant to manage his investments in place of Fleet. Trial Ex. 256. Mayeux's argument that the jury could have used April 17 or 18 to value his shares depends on the theory that, if Fleet had given him appropriate investment advice at the time of his retirement, Mayeux would have declined to follow that advice until after he had replaced Fleet as his investment manager (and then would have followed that advice on one of the only two days in all of 2002 when he could have sold his shares for more than $31). In the court's view, this is a strained argument which, if accepted, would exceed the outer limits of the concept that damages must be rationally based on the evidence.

Conceivably the jury could have arrived at a $14,534,160 figure if more than 463,000 shares were at issue. However, Mayeux consistently testified that approximately 460,000 Fairchild shares had eventually been transferred into Fleet's

7

custody and were ultimately sold by Fleet to pay off his loan. Mayeux Tr. 53-54, 96. See id. 216. As noted above, all of the damage calculations of Mayeux's expert witnesses were premised on 463,000 shares. In light of this testimony, the jury could not rationally have used a different number of shares in arriving at the damage figure for question 5 of the verdict form.

In sum, the court reluctantly concludes that the $10,534,160 figure cannot be sustained. However, the foregoing discussion establishes that a damage figure of up to $10,121,500 could have been sustained. Consistent with its verdict that Mayeux did not receive proper advice from Fleet at or around the time of his retirement, the jury could have concluded that Mayeux, if properly advised, would have sold 463,000 shares of Fairchild on March 8, 2002 at a price of $30.50 and subsequently paid off his $4,000,000 line of credit. He would then have been left with $10,121,500. Given that this figure can rationally be supported by the evidence,[5] the court concludes that a remittitur should be ordered.

For purposes of the remittitur, the court will deduct the $3,086,134 which the jury determined resulted from Mayeux's own negligence. This makes sense for two reasons. First, while the court cannot determine how much the jury would have deducted from a $10,121,500 figure, it certainly would not have deducted any more than $3,086,134. Second, in the context of this case, the difference between $10,534,160 and $10,121,500 is not so great as to result in any significant unfairness to Mayeux if the jury's comparative negligence amount is used.

---

[5] In arguing for remittitur based on the November sales price of Fairchild stock, Fleet appears to concede that the jury could rationally have concluded that, if properly advised by Fleet, Mayeux would have simply sold his Fairchild stock rather than by employing a stock collar or by purchasing options to sell his Fairchild stock. In arguing for remittitur based on the November sales price, Fleet also does not argue that the cost to Mayeux of any sales commission should have been figured in – presumably because the jury did not have any evidence before it as to what commission would have been charged.

Accordingly, for purposes of remittitur, the court shall deduct $3,086,134 from $10,121,500 and set the remittitur amount at $7,035,366.

The entry shall be:

Plaintiff's motion for a new trial on defendant's counterclaim for professional negligence is granted unless defendant remits any damages in excess of $7,035,366 by filing a written acceptance of the remittitur with the clerk's office by August 4, 2006. If defendant files a written acceptance of the remittitur by August 4, 2006, judgment will be entered for defendant on his counterclaim in the amount of $7,035,366. If defendant does not file an acceptance of the remittitur by August 4, 2006, a new trial shall be scheduled.

DATED:  July _11_ , 2006

Thomas D. Warren
Justice, Superior Court

9

= COURTS
nd County
ox 287
ie 04112-0287

JERROL CROUTER ESQ        ‑ Pl
PO BOX 9781
PORTLAND ME 04104

= COURTS
nd County
ox 287
ie 04112-0287

TIMOTHY BRYANT ESQ        ᐟ Pᴜ
PO BOX 9546
PORTLAND ME 04112